JOSEPH B. THOMPSON, Respondent, v. FRANK A. THOMPSON, Trustee of the ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant, No. 41913—240 S. W. (2d) 137.

Court en Banc, May 14, 1951.

Rehearing Denied, June 11, 1951.

74

*E. G. Nahler, C. H. Skinker, Jr., Roscoe Anderson* and *Cullen Coil* for appellant.

*Cox, Cox & Cox, W. F. Smith* and *William A. Moffitt, Jr.,* for respondent.

██ BARRETT, C.—In this action under the Federal Employers' Liability Act, Joseph B. Thompson, a hostler in the Frisco yards at Pensacola, Florida, slipped upon the engine's deck or apron while shaking the grates and fell against the coal gates. The fall activated or "lighted up" a pre-existing arthritic condition and Mr. Thompson has been unable to work since June 4, 1944, the date of the occurrence. Upon this appeal from a judgment in October 1949 for $24,000.00 the meritorious question is whether the trial court erred in refusing to direct a verdict for the railroad at the close of all the evidence.

██ Basically, the plaintiff's case is founded upon the breach of the railroad's nondelegable duty to furnish a safe place to work. 45 U. S. C. A., Sec. 51; Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444. There is no claim that this case falls within the absolute liability of either the Safety Appliance Act or the Boiler Inspection Act. Compare: McCarthy v. Pennsylvania R. Co., 156 F. (2) 877 and Affolder v. N. Y., C. & St. L. R. Co., 338 U. S. 813, 70 S. Ct. 73, 94 L. Ed. 439. The case was submitted to the jury upon the specific hypothesization and finding "that there was oil on the apron of said engine where this plaintiff was required to work, and that said apron was slick and slippery by reason thereof," and that the railroad was negligent "in permitting said place where plaintiff was required to work to become oily and slippery." In this connection, the railroad's liability to its employees under the act is not that of an insurer, liability is only imposed for negligent injury. Wilkerson v. McCarthy, 336 U. S. 53, 69 S. Ct. 413, 93 L. Ed. 497. And in this instance an inherently essential element of the plaintiff's basic case of negligence and a necessary prerequisite to his right to recover is proof that the railroad had notice or knowledge, either actual or constructive, of the presence of oil upon the apron. Wilkerson v. McCarthy, 336 U. S. 53, 60-61, 69 S. Ct. 413, 417, 93 L. Ed. 497, 503-504; Urie v. Thompson, 337 U. S. 163, 178, 69 S. Ct. 1018, 1028, 93 L. Ed. 1282, 1296-1297; Schilling v. Delaware & H. R. Corp., 114 F. (2) 69, 71; Poe v. Illinois Central R. Co., 335 Mo. 507, 73 S. W. (2) 779; Wilson v. Missouri Pac. R. Co., 319 Mo. 308, 5 S. W. (2) 19. So the precise question for decision is whether there is a "complete absence of probative facts to support the conclusion reached" (Lavender v. Kurn, 327 U. S., 1. c. 653) that the railroad had notice, actual or constructive, of the presence of oil upon the apron. If there is any evidence from which the inference of notice could be drawn we are, of course, concluded by the jury's finding. Wilkerson v. McCarthy, supra.

██ Engine 1291, upon which Mr. Thompson was injured, was "put on the spot" in the railroad's Pensacola yards about 10:15 on the night of June 3, 1944, after a run of one hundred fifty-one miles from Magnolia, Alabama. The engine was to remain there until the hostler shook the grates, cleaned it and placed it in the

roundhouse. Mr. Thompson's eight-hour work shift began at 2:30 on the morning of the fourth. He built a fire in a local engine and about 3:30 he and his helper, David DuBose, began working on engine 1291. The helper was working on the ground, outside the engine, "washing it down" and "knocking the fire out." Mr. Thompson was in the cab of the engine shaking the grates. He said that he first shook the grates on the left side of the firebox and then he went over to the right side, "put my shaker bar on the post, started to shake; when I pulled back on it, it was locked, I shoved it over to the boiler head and it slipped off, and my foot slipped from under me, and I fell back in the coal gates." He called to DuBose who helped him to the fireman's seat, and DuBose finished the job of cleaning the engine. When DuBose opened the fire door Mr. Thompson, for the first time, observed that there was some oil down on the shaker bar post and apron. He saw some oil on both the right and the left sides of the apron, there was more on the left than on the right. DuBose said: "Yes, there was some oil on the left hand side of the fire door. It came down from the lubricator, I suppose. Q. This oil that you speak of, that was over on the fireman's side, on the left side? A. Yes, where the lubricator would be. Q. That oil, you figured, came from the lubricator on the left hand side. Is that right? A. That's right. Q. There was not any oil on the right hand side, was there? A. No, sir, not enough to do any harm." From this evidence it was a reasonable inference and conclusion that the oil upon the apron made the cab an unsafe place to work. Hilderbrand v. St. Louis-San Francisco Ry. Co., 220 Mo. App. 1229, 298 S. W. 1069. But, is there a probative fact in all the circumstances from which the jury could draw the further necessary inference that the railroad had either actual or constructive notice of the presence of the oil?

The respondent does not claim that there was actual notice. He urges, however, that there was proof from which it was a possible inference that the oil "could only have gotten there through the active agency of one of defendant's employees" and, therefore, the railroad of necessity, had notice. He says, after the engine was "put on the spot" and in the absence of a hostler, that it was turned over to a watchman whose duty it was to care for the engine and keep the fire up until the hostler took charge of it. The fireman, in testifying for the plaintiff, did say that he had not banked the fire when he "put the engine on the spot" because "They have an engine watchman there" who had the duty of keeping enough steam until the hostler came on duty. But no watchman testified and there was no evidence from anyone that any watchman or any other person was on the engine from the time it was spotted at 10:15 or 10:30 until Mr. Thompson got on it about 3:30. It may be assumed that a watchman did get on the engine, nevertheless there is not a

single fact or circumstance from which it is a possible inference that any such person saw oil on the apron at any time or that he had any duties concerning oil or a lubricator.

In Highfill v. Louisville & Nashville R. Co., 154 F. (2) 874, a boilermaker slipped and fell on grease or oil on an engine's deck but the court said: "The record discloses that the lubricator was customarily drained at the cinder pit before the engine was brought to the roundhouse; * * *." There was testimony from which a reasonable inference could be drawn that, in the process of draining the lubricator, oil might run from the drainpipe, or might overflow the bucket and flow upon the engineer's deck." Consequently, it was a fair and permissible inference that the oil had accumulated on the engineer's deck in consequence of the negligence of some employee of the railroad. But in this case any such possible factual inference is repelled. The fireman, testifying for the plaintiff, said that there was no oil or grease on the apron of the engine when he left it at 10:30. He had washed the deck twelve to fifteen times on the one hundred fifty-one mile trip, the last time just before placing the engine in the yards. There were two lubricators on the engine, the one on the engineer's side "underneath the running board, on the front of the engine" and the fireman said that it was not leaking that night. He said that if it had leaked oil would not get on the apron or deck but would fall below deck on the running gear and engine. He said that there was a lubricator on the fireman's side of the cab but it was not leaking and if it had there would have been no oil on the deck or apron because it would have run down on the boilerhead. In addition, he testified that there was no defect in either of the lubricators and that if there had been any oil on the apron he would have seen it. The engineer, a defendant's witness, said that the lubricators were not leaking and that if they did the oil would not fall upon the deck. He said that there was no oil on the deck when he left the engine. He said "the only way it would ever get on there would be to spill it in putting oil in there, but after you go to work, if the fireman is any good, which they have to be, they take the spray hose with some hot water and washes out the apron and the deck of the engine, and he does that several times on the trip to keep down the coal dust and to keep from getting so dirty." There was no evidence that any person, other than the fireman, had any duty to perform with respect to the lubricators and there is no evidence that any person saw or touched them after the engine was "put on the spot." About seven o'clock the following morning Mr. Thompson again got on the engine and explained to the roundhouse foreman and a boiler inspector how he fell and there was no oil on the apron or deck and Mr. Thompson did not claim to them that he had slipped on oil. A boiler inspector who examined the shakebar and shaker post a day or so before the trial, in St. Louis, described

the mechanism of lubricators in general and said that they could leak if certain parts were missing and that there was oil in a can that sets in a rack on the fireman's side of the engine. But he was not testifying specifically about the lubricators or any oil can on engine 1291. In short, the only evidence concerning oil is that there was some on the apron after Mr. Thompson fell. He saw it and his helper saw it and cleaned it up. But when the oil got there, how it got there and how long it had been there is not to be even conjectured from a single circumstance in the record. The jury's ultimate conclusion and finding of notice (Schonlau v. Terminal R. Ass'n. of St. Louis, 357 Mo. 1108, 212 S. W. (2) 420) rests solely on the two circumstances that the engine was in the yards, "on the spot," from 10:30 until 3:30 and the presence of oil upon the apron after Mr. Thompson fell. All the evidence negatives any possible inference that the oil got on the apron through the agency of any employee and therefore there is no possible basis for the necessary inference that the railroad had or could have had notice of its presence.

In this view of the case it is unnecessary to determine whether the instructions were erroneous or whether the verdict was excessive. Upon the entire record there was a complete absence of probative facts to support the essential conclusion that the railroad had notice, actual or constructive, of the presence of the oil and, therefore, the trial court erred in refusing to direct a verdict for the defendant. Accordingly the judgment is reversed.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court en Banc. All concur.